**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| DONNIE WITTMAN, CORLIS | ) |
| MITCHELL, DEDRIA COOLEY, | ) |
| MYLDRINE CLARK, | ) |
| ROBERT HARTMAN, JR., and | ) |
| JUANITA MANDA, | )    Case No. 22-cv-966-SMY |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) |
| | ) |
| OLIN WINCHESTER, LLC, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM AND ORDER

**YANDLE, District Judge:**

Plaintiffs Donnie Wittman, Corlis Mitchell, Dedria Cooley, Myldrine Clark, Robert Hartman, Jr., and Juanita Manda, current and former employees of Defendant Olin Winchester, LLC ("Olin") bring this wage and hour action Olin pursuant to the Illinois Minimum Wage Law ("IMWL"), 820 ILCS 105/1, *et seq*. and the Illinois Wage Payment and Collection Act ("IWPCA"), 820 ILCS 115/2.   Before the Court are the parties' cross-motions for summary judgment (Docs. 69 and 72).

The Court has carefully considered the briefs and evidence submitted.    For the following reasons, Plaintiffs' Motion for Summary Judgment is **DENIED** (Doc. 69) and Defendant's Motion for Summary Judgment is **GRANTED** (Doc. 72).

## Facts

Olin is a manufacturing company specializing in small-caliber ammunition and components, including sporting ammunition, small caliber military ammunition, and industrial cartridges, with manufacturing operations in East Alton, Illinois (Doc. 72-15, at ¶ 3.1).  Olin's East

Alton manufacturing operations are subdivided into the Primer Island, Primer Assembly, British Cap, and Material Reclaim Facility, among other departments. *Id*. at ¶ 5.

Olin employs approximately 500 hourly, union-represented employees to operate all aspects of the manufacturing process at its East Alton facility (Doc. 72-10, pp. 34-35). Newly hired production employees are subject to a probationary period under the Collective Bargaining Agreement ("CBA") (Doc. 72-15, ¶ 7). During the probationary period, new hires are trained and evaluated so that Olin can decide whether to retain or terminate the employee. *Id*. at ¶ 8. After a 90-day probationary period, new employees are placed on the seniority roster and the CBA governs discipline as well as their eligibility for promotion or transfer into another department (Doc. 72-15, at ¶ 9). The CBA governs the terms and conditions of hourly production employee's employment (Docs. 72-9, pp. 20-21; Doc. 72-4, pp. 11-12; Doc. 72-7, p. 13; Doc. 72-8, pp. 23-24).

## Plaintiffs

### *Wittman*

Donnie Wittman is a former employee who worked for Olin from 1992 to 2022 (Doc. 72-5, pp. 11-12). Wittman was promoted in 2011 from an hourly employee to a salaried manufacturing supervisor in the Primer Island Department. *Id*. at p. 14. Wittman was a supervisor until he retired in 2022. *Id*.

Primer Island makes explosives (Doc. 70-6, at p. 68). Wittman supervised 7 employees each shift. *Id.,* at p. 69. On the day shift, he would arrive at 6:00 a.m., unlock 35 buildings, and then immediately count all the stored explosives. *Id.* at pp. 64-65. He then checked the schedule to see what product they were running that shift. *Id.* As supervisor, Wittman was responsible for making the right amount of explosives to run center fire. *Id.* After he did his count of what

explosive they had, he determined what they needed utilizing a computer program. *Id.*

On second shift, Wittman would arrive at 3:00, walk through the buildings, and do safety inspections. *Id.,* at p. 66. He would then perform safety checks and sign off on each book in the caves where the explosives are stored. *Id.*

If an employee called off, Wittman had to change the schedule. *Id.,* at p. 64. He testified that "If I get call-offs—people nowadays will call off five minutes before the shift, and then if they call off then, I got to change the schedule or force somebody over. If—you know, if I got to cover it, I got to force people over." When asked whether he had the authority to force someone to stay over, Wittman testified "To force somebody to stay, yes." (Doc. 72-5, at pp. 75, 152). He also testified "if I have too many call-offs, I might have to cut back and hope that we have enough, because we always try to make over amount so that if they have production problems up in center fire, then we have extra. So I just make sure that they've got enough to run." *Id.* at pp. 151-152.

Wittman never had a lunch break (Doc. 70-6, at p. 81). There was only one supervisor per shift on Primer Island, so he did not get any relief because there had to be a supervisor on shift at all times. *Id.* His busiest time was in the very beginning of the shift. *Id.* Throughout the rest of the day, he had to count the explosives multiple times, fill out paperwork, and perform video safety audits. *Id.,* at p. 76.

The Safety Department, general foremen, and supervisors did weekly safety audits where they watched a video to make sure the employees were following the proper steps. *Id.* at p. 77. Olin provided a step-by-step procedure for performing the work, and as supervisor, Wittman was looking to see if the step-by-step procedure was being followed. *Id.* at pp. 191-192. If he saw someone not following the proper steps, he would document it for his general foreman who read all of his audits. *Id.* at p. 77. If the general foreman thought something needed to be done, Wittman

was told what to do.  *Id*.

Wittman has never had any responsibility for hiring or firing.  *Id.* at p. 185.  If an employee
was tardy, he would write it down and send it to someone higher up.  *Id.* at p. 150.  He issued
discipline to his employees maybe once or twice a month.  His general foreman would solicit his
input on progressive discipline.  *Id.* at p. 147.

### *Manda*

Juanita Manda was employed as an hourly, front-line operator in the Rimfire
Manufacturing and Primer Manufacturing departments from March 1990 to November 2005 (Doc.
72-9, pp. 19-20).  Olin promoted Manda to supervisor in the Primer Assembly department in
December 2005.  *Id.*, at p. 158.  In March 2018, Manda transferred to work as supervisor in the
Material Reclamation Facility ("MRF"), where she oversaw operations until her retirement on
December 1, 2022. *Id*., at p. 11, 158.

In Primer Assembly, the supervisors rotated working three shifts.  *Id.*, p. 70.  Depending
on which production line Manda was on, she could have as many as 60 hourly employees.  *Id.,* at
p. 45.  A supervisor needed to always be in Primer Assembly.  *Id.* at pp. 57-58.

When Manda arrived on her shift in Primer Assembly, she would first find out who called
off or would be late and redo the schedule because it had to be out before the hourly employees
arrived so they knew where they were working (Doc. 70-8, at p. 45).  She would fill the spots
based on employee skill levels.  *Id.* at p. 185.  She would also check her e-mails and make sure she
had what was needed to run a job.  *Id*. at p. 46.  Everything was done on the computer.  *Id.* at p.
47.  During that first hour Manda typically performed the same tasks she performed throughout
her shift.  *Id.* at pp. 79-80.  Olin required her to be on the floor once an hour visiting the units, and
she had to initial that she was there.  *Id.* at p. 48.  She did inventory.  *Id.* at p. 43.  She would also

sometimes run the machines when the employees asked her if she could step in and help. *Id.* at pp. 60, 76. She issued discipline to employees if they were not meeting production. *Id.* She did not deal with customers in Primer Assembly. *Id.* at p. 48.

Manda's general foreman had an office right behind hers. *Id.* at p. 82. She would discuss products and scheduling with her general foreman when they were present, and when they were not present, she would email them. *Id.* at p. 83. She testified, "You communicated everything that happened on your shift. Whether you thought it was trivial or not, they wanted to know about it." *Id.* at p. 83. Manda would eat at her desk. *Id.* at p. 55.

In 2017, Manda became a supervisor in the MRF. *Id.* at pp. 32-33. She supervised only 5 or 6 employees. *Id.* at p. 64. She did not have any new hires. *Id.* at p. 67. She did not have to train anyone because she had older employees who had been with Olin a long time and knew what was expected. *Id.* at pp. 67-68. There was less paperwork and she was able to be on the floor more. *Id.* at p. 67. Her general foreman was there every day. *Id.* at p. 84. If she was having any issues with an employee or materials, she would interact with her general foreman every day. *Id.* at p. 84.

Manda typically performed the same tasks during that first hour as throughout her shift. *Id.* at pp. 79-80. Sometimes on a Monday, she had to start up the furnace early to let it heat up and then go around and wet everything down to make sure things that could blow up were not dry. *Id.* at pp. 128-129. She had an hourly employee with her when she did this, which would take about two hours. *Id.* at p. 129. She testified, "An employee was not allowed to be in the plant without a supervisor." *Id.* at p. 129. At the end of her shift, Manda would walk through with the next supervisor to make sure that the job was being left clean. *Id.* at pp. 71-72.

In both Primer Assembly and MRF Manda had trainers on every shift that trained the employees. *Id.* at pp. 77-78. She issued discipline as needed to her employees. *Id.* at p. 141. She had safety meetings every day. *Id.* at p. 75. Her first priority was keeping everyone safe. *Id.* at pp. 145-146. She did not participate in interviews for new hires or make decisions regarding promotions. *Id.* at pp. 139-140, 146.

### *Clark*

Myldrine Clark was employed as an hourly, front-line operator in Olin's Shot Shell, Rimfire, and Primer Manufacturing departments from February 1992 to December 2010 (Doc. 72-4, pp. 21-22). In January 2011, Clark accepted Olin's offer of a promotion to serve as supervisor in the Primer Assembly department. *Id*. at pp. 24-25. Clark retired in 2024.[1]

Clark arrives at work at the same time as her group leader [an hourly employee]. *Id.* at p. 66. About half of Clark's time is spent on the floor versus in the Supervisor's office. *Id.* at p. 65. On the floor, she has to check the units often and walk to two different sides of the building to get to her production units. *Id.* at p. 65. During her first hour, she is typically dealing with call-offs and scheduling changes, paperwork and inventory. *Id.* at p. 66. She supervises up to 39 hourly employees per shift. *Id.* at p. 30.

Clark holds safety meetings on Mondays and Thursdays. *Id.* at p. 43. The Safety Department sends out a "Toolbox Talk" that has the different subjects that she is required to cover. *Id.* at pp. 43, 73. She completes evaluations for new employees who are on their probationary period (Doc. 72-4 at pp. 40-41). When evaluating new hires, she is given an in-house evaluation form that comes from HR that she fills out (Doc. 70-7, at p. 41). When asked whether her feedback is "used for determining whether a new hire should be taken off probationary status," Clark

---

[1] At the time of her deposition, Clark was employed as a supervisor in the Primer Department.

testified "sometimes it is" and "[i]f they are not up to par then they would either place them someplace else or they would place them on layoff status" (Doc. 72-4 at p. 41).

Clark was responsible for issuing discipline if someone violated workplace rules (Doc. 72-4 at p. 40). She testified, "I know when to issue an oral warning and then after 90 days if they don't have the same occurrence then it comes out, but if they have the same occurrence then it will go to a written disciplinary action." *Id.* at p. 115. Clark has also participated in employee grievance procedures. *Id.* at pp. 67-69.

Clark testified, "we force for overtime, we call in, we do vacations, we do the group leader paperwork, the production paperwork, we do out scrap reports, our production reports, we do manifest reports." "If we need to run something special and I need extra people, we'll go by volunteers. If no one wants to volunteer over, there might be someone volunteering to come in eight hours early to cover that, and then we would call them people in early and give them plenty of time so they can come in and cover." *Id.* at p. 46.

### *Mitchell*

Corlis Mitchell was employed as an hourly, front-line operator in the Rimfire Manufacturing and Primer Manufacturing departments from August 2000 to January 2021 (Doc. 72-8, at p. 19). Mitchell served Supervisor in the Primer Island facility from January 2021 until her termination in February 2023 (Doc. 72-8, pp. 40-41).

Primer Island produces gunpowder for Olin's production units. *Id.* at p. 25. The work in Primer Island is governed by government regulations and company Standard Operating Procedures ("SOPs"). *Id.* at p. 32. She would make sure that her employees were staying within the SOP's. *Id.* at p. 33. There were two shifts and only one supervisor per shift. *Id.* at p. 63. Mitchell was responsible for supervising 5 or 6 employees on each shift. *Id.* at. p. 56.

Mitchell testified she would "count the explosives, check the schedule, order material, go up the hill to primer department and check their schedule to see if there were any changes to the production needs, come back to my office and make accommodations to the schedule to make sure that they had the explosives that they need." *Id.* at pp. 51-52. In Primer Island "you have a lot of needs, and you kind of have to decide – you make judgement calls based on they're not running really good in primer, so we're probably going to gain explosives, this type of explosive versus that type of explosive, so I'm going to make this instead of that. Those kind of decisions, just from experience, and based on production needs." *Id.* at pp. 196-197.

On day shift if there was no British Cap supervisor there, Mitchell would arrive in the morning and stop at the guard shack to pick up the government keys and then unlock the buildings that contain the gunpowder. *Id.* at p. 66. If there was a British Cap supervisor, she would unlock the gate to the Primer Island, turn on the humidity control and the video monitors and begin unlocking the buildings and checking the explosives to make sure they were covered in water. *Id.* at pp. 66-67. It usually took her 35 to 40 minutes to unlock the buildings. *Id.* at p. 69.

Mitchell was required to do one audit of an operator per week. *Id.* at p. 68. Epps would tell her who to audit. *Id.* at pp. 97, 98. She would watch that employee perform a procedure on video, either real-time or pre-recorded, and then write up what she saw and submit it to Epps, Tony Whaley and Safety. *Id.* at pp. 97-98. Any verbal coaching she gave to an employee was documented and sent to Epps and Whaley. *Id.* at p. 93

### *Hartman*

Robert Hartman was employed as an hourly, front-line operator in a variety of departments, including Rimfire, Primer Manufacturing, and Metallic Loading from July 1993 to March 2009 (Doc. 72-15). Hartman was promoted to Supervisor in the Centerfire Load facility in April 2009

(Doc. 72-6, p. 30). He transferred into the Primer Assembly department in March 2012 (Doc. 72-15). After seven years as a Supervisor in Primer Assembly, Hartman transferred to the British Cap department in August 2021, where he continues to work as a supervisor (Doc. 72-6, p. 7).

Hartman testified that in Primer Assembly, he worked double shifts many times (Doc. 70-4, p. 54). If he worked a double shift from 7:00 a.m. to midnight [17 hours] he was only allowed to record 16 hours. *Id*. at pp. 54-55. He was there before his employees arrived to get the building unlocked and ready for them to start and was there until they left so he could lock up the building and return the keys. *Id.* at p. 16. Hartman was very rarely in the office when he was a supervisor in Primer Assembly. *Id.* at p. 56. He was always on the floor making sure everything was running, whether maintenance needed to be done, looking for safety issues and making sure everybody was doing what they were supposed to. *Id.* at p. 56. There was no scheduled lunch break; he just ate when he could while catching up on paperwork or sitting at the computer. *Id.* at p. 57. He was not allowed to leave the plant during the shift unless he took personal or sick time. *Id*. at pp. 57-58.

Hartman received a scorecard each month telling him what primers needed to be produced during the month by quantity, which materials were needed and what quantity of materials were needed (Doc. 72-5, at p. 95). He decided which units needed to run the primers on the list (Doc. 70-5, pp. 95-96). Hartman testified, "we have a set schedule of employees that are scheduled in that rotate with our shift . . . [t]hose are the employees, we're always scheduling them on jobs that we know they know how to run and move them around." (Doc. 72-6, p. 96). He implemented the employee schedule each day. *Id*. Hartman ran safety meetings daily and testified, "the first thing we're doing is getting our safety meeting together. We're required to have a daily safety meeting for everybody to sign off on. I'm getting that put out for the employees. I do my building checks

and my dryer checks during that first time to make sure everything is safe for the employees that are coming in." *Id*. at pp. 66-67; 98-99.

When issues arose that he could not handle himself, Hartman would pass it on to quality or manufacturing or engineering to see if they could come up with a solution to make the area run more efficiently or safer. He had no communication with internal or external customers while in Primer Assembly; customer changes were communicated to the manager. *Id*. at pp. 106-107. Hartman monitored his employees, made sure they were meeting the numbers needed for the scorecards, moved people around to get the correct performance. If an employee was not performing, he would see if there was something that he could help them do with an additional employee or additional training. If they just were not able to do the job, he would try to get progressive discipline going until they picked up on their production (Doc. 72-6, pp. 123, 131). During the first 90 days, if he did not think the employee could do the job, he would try to recommend that they not work there anymore. *Id*. at p. 112. Hartman could not recall an instance where he recommended that a poor-performing employee be let go, although those employees were moved out of his department. *Id*.

Hartman moved from Primer Assembly to the British Cap Department in July or August 2021 (Doc. 72-6, p. 54). Although his hours occasionally varied, 75% of the time he had to unlock the building and have everything open by 5:00 a.m. for the hourly employees. *Id*. at pp. 26-27. Hartman supervised union employees. *Id*. at p. 19. He did a lot of paperwork, recording what was run that day, when it was manufactured, and when it was shipped because British Cap is strictly a governmental facility. *Id*. at p. 28. During the first hour of each shift, Hartman typically performed the same tasks he performed throughout his shift, including building checks and making sure the employees had all the supplies needed. *Id*. at pp. 66-67. If supplies were needed, he reported that

to his general foreman and his general foreman got the materials (Doc. 70-5 at pp. 177-178).  At the end of the shift, Hartman relocked everything and returned the keys to the guard shack.  *Id*., at pp. 28-29, p. 70.

Hartman has very little communication with the government in British Cap (Doc. 70-5, at p. 103).  He only makes one product for the government.  *Id.* at p. 104.  He gets a list from the government procurer telling him how many to produce, and when they are ready, he ships it to them.  *Id.*  He had no communication with any external government or manufacturing customers. *Id.,* at p. 106.  If he runs low on materials in British Cap, he phones his boss to tell him, and his boss sees if they can work with the customer.  *Id.* at p. 117.  Hartman rarely provides training to hourly employees.  *Id.,* at p. 109.  Normally, they are trained by other hourly employees and Hartman just supervises them.  *Id.*

Hartman had no authority to hire or fire.  *Id.*at p. 175.  He testified that to hold his direct reports accountable, "I try to get progressive discipline going until they do pick up on their production." (Doc. 72-2 ¶ 80).

### *Cooley*

Dedria Cooley was employed as an hourly, front-line operator in the Rimfire and Primer Manufacturing departments from May 1989 to July 2008 (Doc. 72-7, p. 10).  In July 2008, Olin promoted Cooley to supervisor in the Primer Assembly department, where she continues to work to date.  *Id*. at p. 16.

There are three shifts in the Primer Department.  *Id.* at p. 17.  The shifts rotate weekly.  *Id.* at p. 36.  The hourly employees assigned to her rotate with her so she is always supervising the same group.  *Id.* at p. 37.  Regardless of which shift she is assigned, when she arrives for her shift, she has to make changes to the schedule for any call offs.  *Id.* at pp. 28, 29.  Cooley testified "I

schedule – work on my schedule.  Change it around according to people who have called off. There's a board outside our door that we have to fill out for the next shift, so I do that.  I go into Kronos and put in the people that have called off for that day." *Id.* at pp. 28-29.  She also testified that "every day it could be something different.  Sometimes you'll get somebody come in the office; they want to trade jobs with another person, so you have to decide if you're going to let them do it.  And like I said, you have to sometimes decide whether to shut down a unit or force to run a unit, depend on your call-offs and stuff like that." *Id*. at pp. 110-111.

Every hour or two, Cooley has to go out and check the units, check the housekeeping, and sign off on the target sheets at each unit. *Id.* at pp. 31-32.  Every Monday and Thursday, Olin sends her "Toolbox Talks," which are topics that they direct her to talk to her employees about. *Id.* at pp. 39, 40.  She spends about half her time on the floor and half in the office. *Id.* at pp. 39-40.  She usually leaves work about 10 or 15 minutes after the hourly employees. *Id.* at pp. 41-42.

The work at Olin is very highly regulated. *Id.* at p. 116.  There are a lot of rules and regulations that have to be followed, in addition to Olin policies. *Id.* at p. 116.  There has to be a supervisor in the Primer Department at all times. *Id.* at p. 5.  Cooley interacts with her general foreman, Matt Wiggenhorn "quite a bit. Its hands on." *Id.* at p. 47.

Cooley does not do any hiring or firing. *Id.* at pp. 105, 112.  If she thinks an employee is not a good fit for the job, she lets her boss know. *Id.* at p. 115.  She has made recommendations that someone needs to be fired or removed; sometimes those are followed and sometimes not. *Id.* at p. 165.

### Plaintiffs' Supervisory Duties

As Supervisors, Plaintiffs reported at various times to Kenny Pohlman, Dee Epps, and Matthew Wiggenhorn, among other Olin employees (Doc. 72-5, pp. 15-16, pp. 43-44; Doc. 72-6,

p. 93; Doc. 72-4, p. 27; Doc. 72-7, pp. 25-26; Doc. 72-9, p. 34; Doc. 72-11, pp. 44-46; Doc. 72-16 at ¶ 5). Pohlman was a Manager from approximately 2003 to 2021, and oversaw the Primer Island, Explosive Components, and MRF departments, among others during that time (Doc. 72-11, p. 15, p. 30). Epps was a General Supervisor over the Primer Island and Primer Assembly departments, and served in that role from 2020 until her retirement in June 2024 (Doc. 72-12, p. 20). Epps managed Wittman, Mitchell, and Hartman. *Id*. at pp. 22-24. Wiggenhorn is currently the Manager of the Primer department, and has been in the Manager role since 2019 (Doc. 72-13, pp. 23-24). He previously was Manager of the Centerfire, Primer, Metals Fabrication, and Cupping departments. *Id*. Before his promotion to Manager, Wiggenhorn was employed as the General Supervisor in the Primer Assembly, British Cap, Ejection Cartridge, High Explosives, and Primer Island departments beginning in 2011. *Id*. at pp. 17-18. Wiggenhorn was also a supervisor in Primer Island and British Cap from 2004 to 2011. *Id*.

Olin's East Alton facility operates 24-hours a day, at least five days a week, on a rotating schedule of eight-hour shifts (Doc. 72-14, at 6). Only one supervisor is present on the shifts that Plaintiffs oversee. *Id*. at ¶ 8. As supervisors, Plaintiffs are all "considered managers," (Doc. 72-10, p. 116), and Olin's "Leading with Integrity: A Guide for Managers" handbook applies to Plaintiffs. *Id*. Dave Haskins, Olin's Vice President of Human Resources, testified "Leading with Integrity: A Guide for Managers" is "a training and information that we provide to employees and managers to understand expectations for Leading with Integrity as related to our Code of Conduct." (Doc. 72-10, p. 116). The Guide states "As a manager or supervisor, you have a special responsibility when it comes to upholding our Code. You have a greater influence on your employees than anyone else in Olin." *Id*. It lists responsibilities that the "company depends on you to [do,]" including "Respond promptly and appropriately to resolve issues" and "Evaluate

employee behavior based on our Code." *Id*.

The job description for Manufacturing Supervisor in Primer Assembly lists "basic functions and responsibilities" which include to "be visible on the floor of the manufacturing operations," "ensure that planned product schedules are met on a timely basis," "explain, interpret, and enforce General Plant Rules and Regulations," "promote good employee relations; motivate and monitor employees," "issue discipline and participate in grievance proceedings as needed," "monitor product and material flow to effectively utilize employee's equipment assets," "maintain records pertinent to the job assignment," and "ensure compliance with safety programs and training requirements" (Doc. 72-4, p. 29). Clark, Cooley, Hartman, and Manda testified that they each performed those functions and responsibilities in their roles as supervisors (Doc. 72-4, pp. 36-38; Doc. 72-6, p. 95; Doc. 72-7, p. 99; Doc. 72-9, pp. 135-136).

The job description for Manufacturing Supervisor in Primer Island lists "basic functions and responsibilities," which include to "manage daily activities to ensure achievement of department performance goals," "explain, interpret, and enforce General Plant Rules and Regulations," ensure compliance with Standard Operating Procedures and Job Safety Practices," "schedule daily production to meet internal customer demand," inventory and control raw materials," "supervise and train hourly personnel," "promote good employee relations; motivate and monitor employees," "issue discipline and participate in grievance proceedings as needed," "monitor product and material flow to effectively utilize employee's equipment assets," "maintain records pertinent to the job assignment," "ensure compliance with safety programs and training requirements" (Doc. 72-8, pp. 182-183). When asked whether the job description "accurately summarizes the types of responsibilities you had as a supervisor on Primer Island," Mitchell testified "Yes." *Id*. When asked whether the job description "summarizes a lot of the functions

that you perform[ed] in the supervisor role on Primer Island," Wittman testified "Yes." (Doc. 72-5, pp. 147-148).

The job description for Manufacturing Supervisor in Explosive Components, which includes British Cap, lists "basic functions and responsibilities," which include to "manage daily activities to ensure achievement of department performance goals," "explain, interpret, and enforce General Plant Rules and Regulations," "ensure compliance with Standard Operating Procedures and Job Safety Practices," "schedule daily production to meet internal customer demand," "inventory and control raw materials," "supervise and train hourly personnel," "promote good employee relations; motivate and monitor employees," "issue discipline and participate in grievance proceedings as needed," "monitor product and material flow to effectively utilize employee's equipment assets," "maintain records pertinent to the job assignment," and "ensure compliance with safety programs and training requirements" (Doc. 72-6, pp. 100-102). Hartman testified "the general description of basic functions seems like the correct description for my job, yes." *Id*.

The job description for Manufacturing Supervisor in the Material Reclaim Facility lists "essential functions," which include to "be visible on the floor of the manufacturing operations," "ensure that planned product schedules are met on a timely basis," "explain, interpret, and enforce General Plant Rules and Regulations," "promote good employee relations; motivate and monitor employees," "issue discipline and participate in grievance proceedings as needed," "plan, schedule, and supervise reclamation and disposal activities related to scrap metal or rejected ammunition production and materials," "coordinate transfer of scrap with manufacturing departments as required," and "ensure compliance with safety programs and training requirements" (Doc. 72-9, pp. 146-147). Manda testified that those were her responsibilities as

MRF supervisor.  *Id*.

**Plaintiffs' Salaries**

Plaintiffs' base salary is expressed in their pay records as a "monthly" "pay rate" (Doc. 72-15, ¶¶ 14-19).  They were paid twice a month (Doc. 72-4, p. 48; Doc. 72-5, p. 32; Doc. 72-6, p. 84; Doc. 72-7, p. 76; Doc. 72-9, pp. 114-115).

Olin paid Clark gross wages in the amount of $108,608.29 in 2019, $110,152.36 in 2020, $106,871.12 in 2021, $119,377.08 in 2022, and $111,615.08 in 2023 (Doc. 72-15, ¶ 14.  Since April 2019, Clark's monthly rate has been no less than $5,957.  *Id*.  Effective March 1, 2023, Clark's monthly rate was $7,240 (Doc. 72-15, p. 12).

Olin paid Cooley gross wages in the amount of $98,815.50 in 2019, $97,411.71 in 2020, $100,822.61 in 2021, $105,752.64 in 2022, and $104,075.49 in 2023 (Doc. 72-15, ¶ 15.  Since April 2019, Cooley's monthly rate has been no less than $6,356.  *Id*.  Effective March 1, 2023, Cooley's monthly rate was $7,071.  *Id*. at p. 14.

Olin paid Hartman gross wages in the amount of $94,816.15 in 2019, $106,369.38 in 2020, $109,382.59 in 2021, $102,773.44 in 2022, and $111,347.44 in 2023 (Doc. 72-15, ¶ 16).  Since April 2019, Hartman's monthly rate has been no less than $6,258.  *Id*.  Effective March 1, 2023, Hartman's monthly rate was $7,313.  *Id*.

Olin paid Mitchell gross wages in the amount of $103,950.75 in 2021 and 93,103.34 in 2022 (Doc. 72-15, ¶ 17).  Since her promotion to position in January 2021, Mitchell's monthly rate has been no less than $6,250.  *Id*.  Effective March 1, 2022, Mitchell's monthly rate was $6,344. *Id*. at p. 18.

Olin paid Wittman gross wages in the amount of $104,104.99 in 2019, $104,995.92 in 2020, $94,493.61 in 2021, and $97,155.99 in 2022 (Doc. 72-15, ¶ 18).  Since April 2019,

Wittman's monthly rate has been no less than $6,298.  *Id*.  Effective March 1, 2023, Wittman's

monthly rate was $7,007.  *Id*. at p. 20.

Olin paid Manda gross wages in the amount of $86,432.56 in 2019, $89,321.16 in 2020,

$90,750,40 in 2021, and $88,183.30 in 2022 (Doc. 72-15, ¶ 19).  Since April 2019, Manda's

monthly rate has been no less than $6,130.  *Id*.  Effective March 1, 2022, Manda's monthly rate

was $6,425*. Id*. at p. 22.

### Premium Pay Policy

The Premium Pay policy states in relevant part:

> Supervisory positions which are responsible for the direct supervision of hourly
> employees will receive one and one-half times their hourly rate of pay… and the hourly
> rate of pay is calculated as an annual base salary divided by 2080… The base salary in
> effect the month of actual payment will be the rate used for calculating overtime or
> premium pay… Overtime hours covered under this policy must be scheduled and
> authorized by the supervisor…. Casual overtime is not included for pay… examples of
> casual overtime include [t]ime spent either before or after the employee's regular shift for
> the purposes of exchanging information with another supervisor, taking care of
> paperwork, conducting safety meetings, or other normal requirements of the position;"
> traveling on company business and time spent attending functions as required of the
> position, for example staff meetings, safety meetings, seminars or training programs,
> either before or after the regular shift or on the employee's regularly scheduled day off.
> (Doc. 72-8).

Under the Policy, overtime hours had to be scheduled and authorized by the supervisor.

Haskins testified that the Policy did not entitle Plaintiffs to receive time and half for all

hours worked over 40 in a work week: "I disagree that [the Policy] states they'll receive one and

a half times their hourly rate for all hours…those hours have to be legitimate.  They have to be

hours that are eligible for payment…hours can't fall under the casual overtime definition

examples." (Doc. 72-10, at pp. 50-52).  Regarding casual overtime, Haskins testified that casual

overtime includes time coming in to prepare for your shift: "my understanding is either you're

coming in to receive turnover from the supervisor that is already on shift, or if the department has

been down, you're coming in to prepare the department to start up." *Id.* at pp. 50-52. Haskins further testified that a supervisor's regular shift is the shift time that they need to cover to support manufacturing operations. *Id.* at pp. 71-72. Supervisors were to record all hours that are authorized under the Policy. And if the hours they record are not authorized under the Policy, then they should be removed from the timecard so they are not paid improperly. *Id.* at pp. 64-65.

Wittman, Clark, and Manda testified that they were told after they became salaried that Olin expected salaried employees to work one hour of casual time (Doc. 72-5, at p. 25; Doc. 72-4, at p. 49; Doc. 72-9, at pp. 87, 179-180). Pohlman testified he told supervisors about the casual overtime when they were hired "like I said, when I first hired [Clark] I told her that she would be working nine hours but putting down eight hours and she agreed to it, no comment, no rejection." (Doc. 72-11, pp. 94-95). Wiggenhorn testified that "we've always just gotten our shift ready before and after, and we put down eight hours a day." (Doc. 72-13, pp. 48-50). Cooley and Hartman testified that it was her understanding that the nine hours per day, regular shift plus one hour, was included in her base salary (Doc. 72-7, p. 58; Doc. 72-6, p. 76). Pohlman testified that nine hours is part of supervisor's base pay (Doc. 72-11, p. 65).

When asked if they had seen the Premium Pay Policy before, Manda testified "not until my lawyer showed it to me." (Doc. 72-9, at p. 95). Cooley testified that "it didn't look familiar, but I might have." (Doc. 72-7, p. 140). Wittman testified that he did not recall (Doc. 72-5, p. 87).

## Discussion

Summary judgment is proper only if the moving party can demonstrate there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); s*ee also Ruffin-Thompkins v. Experian Information Solutions, Inc.*, 422 F.3d 603, 607 (7th Cir. 2005). For cross-motions for

summary judgment, the Court must "look to the burden of proof that each party would bear on an issue of trial; we then require that party to go beyond the pleadings and affirmatively establish a genuine issue of material fact." *Santanella v. Metro Life Ins. Co.,* 123 F.3d 456, 461 (7th Cir. 1997). The factual and inferential construction is unaltered by the procedural nuance of cross-filings, for each party retains their "respective burdens on cross-motions for summary judgment." *McKinney v. Cadleway Props., Inc.*, 548 F.3d 496, 504 n.4 (7th Cir. 2008). "Cross-motions must be evaluated together, and the court may not grant summary judgment for either side unless the admissible evidence as a whole – from both motions – establishes that no material facts are in dispute." *Bloodworth v. Vill. of Greendale*, 475 Fed. Appx. 92, 95 (7th Cir. 2012).

Both parties move for summary judgment on Plaintiffs' Illinois Minimum Wage Law claim (Count I) and Illinois Wage Payment and Collection Act claim (Count II). The Court addresses their positions collectively for each count below.

### Illinois Minimum Wage Law ("IMWL")

In Count I, Plaintiffs allege that they do not meet the duties or salary basis test under the applicable law, and therefore, Olin misclassified each plaintiff as salaried exempt. Under the IMWL, employers are required to pay their employees overtime wages for any hours worked more than 40 hours per week unless the employee qualifies for an exemption. 820 ILCS 105/4a. The IMWL exempts:

> Any employee employed in a bona fide executive, administrative or professional capacity… as defined by or covered by the Federal Fair Labor Standards Act of 1938 and the rules adopted under that Act, *as both exist on March 30, 2003*, but compensated at the amount of salary specified in subsections (a) and (b) of Section 541.600 of Title 29 of the Code of Federal Regulations as proposed in the Federal Register on March 31, 2003 or a greater amount of salary as may be adopted by the United States Department of Labor.

820 Ill. Comp. Stat. Ann. 105/4a(2)(E) (emphasis added).  Therefore, Plaintiffs' claim under the statute is governed by the Fair Labor Standards Act ("FLSA") regulations that existed prior to the April 23, 2004 comprehensive amendments which altered the definition of individuals "employed in a bona fide executive, administrative, or professional capacity." *Nettles* v. *Allstate Ins. Co.*, 980 N.E.2d 103, 110 (Ill. App. Ct. 2012) ("The statutory language of section 4a(2)(E) is clear and unambiguous.  In amending the section, the Illinois legislature sought to follow the federal rules and regulations exactly as they existed on March 30, 2003, except at a salary amount designated by the Department of Labor.").

The 2003 regulations set forth a six-part test (the "long test') and a three-part test (the "short test") for determining whether the executive exemption applies to an employee.  29 C.F.R. § 541.1(2003).  The "short test" applies to an employee who earns not less than $250 per week.  29 C.F.R. § 541.1(f) (2003).  Because it is undisputed that each plaintiff earned more than $250 per week at all times relevant to this action, the short test applies.

Under the short test, Olin must prove that Plaintiffs (1) were compensated on a salary basis; (2) that their primary duty was managing the enterprise or managing a customarily recognized department or sub-division of the enterprise; and (3) that they customarily and regularly directed the work of at least two or more other full-time employees or their equivalent.  There is no dispute that Plaintiffs regularly directed the work of at least two or more hourly employees.  Therefore, the Court turns its analysis to the salary requirement and duties test.

### *Salary Requirement*

The IMWL requires executive employees to be paid on a "salary basis" of not less than $684 per week.  29 C.F.R. § 541.600.[2]  An employee is paid on a salary basis when he receives

---

[2] This amount changed to $844 per week effective July 1, 2024.  *See* 29 C.F.R. 541.600.

"on a weekly, or less frequent, basis a predetermined amount constituting all or part of the
employee's compensation, which amount is *not subject to reduction* because of variations in the
quality or quantity of the work performed."  29 C.F.R. § 541.602 (emphasis added).  However,
deductions can be made when an exempt employee is absent from work for one or more full days
for personal reasons.  29 C.F.R. 541.602(b); *see also Kennedy v. Commonwealth Edison Co*., 410
F.3d 365, 376 (7th Cir. 2005) (affirming finding that an employee was exempt where the employer
paid same amount of money but deducted personal leave time when an employee chose to take an
"unpaid" day off).

Here, Olin paid Plaintiffs a monthly salary of between $5,957 and $7,313 on a semi-
monthly basis (excluding premium pay or discretionary bonuses).  Plaintiffs testified that they
received the same base salary each semi-monthly pay period.  Although Plaintiffs contend they
were told on multiple occasions that their salaries would be reduced if they exhausted paid leave,
they admit that no such reductions have ever occurred.  *See Klein v. Rush–Presbyterian–St. Luke's
Med. Ctr.* 990 F.2d 279, 286 (7th Cir. 1993) ("when the regulation's interpretations state that a
salaried employee's pay 'is not subject to reduction because of variations in the quality or quantity
of the work performed,' 29 C.F.R. § 541.118(a), a *reduction* of salary must have actually occurred
for an employee to lose the exemption." (emphasis in original)).  The fact that Olin also
compensated Plaintiffs with premium pay is not inconsistent with them being paid on a salary
basis.  *See* 29 C.F.R. § 541.604(a); *Kennedy,* 410 F.3d at 371.  As such, Olin has established that
Plaintiffs were paid on a salary basis, satisfying the first requirement of the executive exemption
under the IMWL.

### *Primary Duties*

The second requirement is that the employee's primary duty was management of a customarily recognized department or subdivision. Unlike the salary basis test which is materially unchanged since the former regulations, the duties tests under the IMWL are substantially different from those in the current FLSA regulations. An employee's "primary duty" is his "principal, main, major or most important duty[,]" and the regulations provide a non-exclusive list of activities that constitute "management":

> interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

29 C.F.R. § 541.102. The regulations are written in a general way to apply to many different scenarios, so an employee does not need to perform all these duties to be a manager. *Brown v. Aleris Specification Alloys, Inc.,* 2016 WL 1183207, at *4 (N.D. Ind. Mar. 28, 2016).

The evidence shows that Plaintiffs' primary duty as supervisors in the various departments constitutes management under the regulations. The thrust of their work was to ensure the production ran smoothly. Plaintiffs testified that they planned and directed work, scheduled their direct reports and forced them to work overtime when necessary, monitored inventory and managed production material to meet department goals, and ensured the safety of their direct reports. Plaintiffs agree that their job descriptions accurately reflect their basic functions and

responsibilities as supervisors in the Primer Assembly, Primer Island, British Cap, and Material Reclaim Facility:

> Manufacturing Supervisor in Primer Assembly: to be visible on the floor of the manufacturing operations; ensure that planned product schedules are met on a timely basis; explain, interpret, and enforce General Plant Rules and Regulations; promote good employee relations; motivate and monitor employees; issue discipline and participate in grievance proceedings as needed; monitor product and material flow to effectively utilize employee's equipment assets; maintain records pertinent to the job assignment; and ensure compliance with safety programs and training requirements.

> Manufacturing Supervisors in Primer Island and British Cap: manage daily activities to ensure achievement of department performance goals; explain, interpret, and enforce General Plant Rules and Regulations; ensure compliance with Standard Operating Procedures and Job Safety Practices; schedule daily production to meet internal customer demand; inventory and control raw materials; supervise and train hourly personnel; promote good employee relations; motivate and monitor employees; issue discipline and participate in grievance proceedings as needed; monitor product and material flow to effectively utilize employee's equipment assets; maintain records pertinent to the job assignment; and ensure compliance with safety programs and training requirements.

> Manufacturing Supervisor in the Material Reclaim Facility: be visible on the floor of the manufacturing operations; ensure that planned product schedules are met on a timely basis; explain, interpret, and enforce General Plant Rules and Regulations; promote good employee relations; motivate and monitor employees; issue discipline and participate in grievance proceedings as needed; plan, schedule, and supervise reclamation and disposal activities related to scrap metal or rejected ammunition production and materials; coordinate transfer of scrap with manufacturing departments as required; and ensure compliance with safety programs and training requirements.

Hartman testified that, as supervisor in the Primer Assembly, he was always on the floor making sure everything was running, whether maintenance needed to be done, looking for safety issues and making sure everybody was doing what they were supposed to. He monitored his employees, made sure they were meeting the numbers needed for the scorecards, and moved people around to get the correct performance. He further testified that if an employee was not performing, he would see if there was something that he could help them do, an additional

employee or additional training.  If they just were not able to do the job, he would try to get progressive discipline going until they picked up on their production.

Manda testified that her responsibilities as a supervisor in Primer Assembly included scheduling employees, performing inventory, deciding which units needed to be run, walking the floor and visiting the units, holding safety meetings, and issuing progressive discipline as needed. She discussed products and scheduling with her general foreman and communicated everything to them.

Mitchell was also a supervisor in Primer Island.  She testified that some of her responsibilities included counting the explosives, checking the schedule, ordering materials, monitoring production needs.  She also performed weekly audits and monitored employee training.

As a supervisor in Primer Island, Wittman was responsible for making the right amount of explosives to run center fire, performing safety checks, scheduling employees, completed paperwork, and performed video safety audits.  He testified that if he saw someone not following the proper procedure, he would document it for his general foreman.  His general foreman would solicit his input regarding progressive discipline, although Wittman never had any responsibility for hiring or firing.

Clark testified that her responsibilities as supervisor in the Primer Assembly include dealing with call-offs, scheduling changes, paperwork, and inventory.  Clark holds safety meetings twice a week based on safety information sent by the Safety Department.  As supervisor, she completes evaluations for new employees during their probationary period.  She is also responsible for issuing progressive disciplinary to employees.  Similarly, Cooley testified that her job responsibilities as a supervisor in Primer Assembly included making scheduling changes,

performing unit checks, ordering necessary supplies, monitoring her employees, and making sure her shift runs smoothly.

Plaintiffs nevertheless argue that they do not meet the duties test under the executive exemption because they did not have the authority to hire or fire other employees and their suggestions and recommendations were not given any particular weight – those decisions were dictated by a collective bargaining agreement and Human Resources. But the authority to hire and fire is not a requirement of the IMWL short test which incorporates the duties test from the DOL regulations in effect on March 30, 2003. 820 ILCS § 105/4a(2)(E). And as numerous courts have held, work environments regulated or constrained by a collective bargaining agreement is not fatal to the exemption. *See Brown v. Aleris Specification Alloys, Inc.,* 2016 WL 1183207, at *8 (N.D. Ind. Mar. 28, 2016) (plaintiff's lack of influence over personnel decisions like hiring and firing and scheduling which were governed by CBA not fatal) (collecting cases).

There are no material issues of fact regarding Plaintiffs' status as salaried executive employees exempt from the IMWL. Accordingly, Olin's motion for summary judgment on Count I is granted, and Plaintiffs' motion is denied.

### Illinois Wage Payment and Collection Act ("IWPCA")

In the alternative, Plaintiffs assert that they are entitled to summary judgment on Count II under the IWPCA because Olin's overtime policy promised that the Plaintiffs would be paid time and a half for all hours worked over 40 hours in a workweek. Olin argues that the parties did not mutually assent to pay Plaintiffs an equivalent of statutory overtime.

Under the IWPCA, employees may have "a cause of action against employers for the timely and complete payment of earned wages." *Enger v. Chi. Carriage Cab Corp.*, 812 F.3d 565, 568 (7th Cir. 2016). The IWPCA defines wages as "any compensation owed an employee by an

employer pursuant to an employment contract or agreement between the 2 parties...."  820 ILCS 115/2.  An agreement under the statute is broader than a contract and requires only a manifestation of mutual assent on the part of two or more persons; parties may enter into an agreement without the formalities and accompanying legal protections of a contract.  *Zabinsky v. Gelber Grp., Inc*., 807 N.E.2d 666, 681 (Ill. App. Ct. 2004); *Enger*, 812 F.3d at 568.  The IWPCA does not provide substantive relief beyond what the underlying employment contract or agreement requires; it only enforces the terms of an existing contract or agreement.  *Enger*, 812 F.3d at 570; *see also Chagoya v. City of Chicago*, 992 F.3d 607, 624 (7th Cir. 2021).

Plaintiffs contend that Olin deviated from the Overtime & Premium Pay Policy (the "Policy") by excluding one hour per shift and split hours from its calculation of each Plaintiff's pay.  They argue that they were scheduled and authorized to work the unpaid hour and should have been compensated at one- and one-half times their hourly rate pursuant to the Policy.  Olin maintains that while covered employees are to receive additional pay for performing certain work under the Policy, casual overtime is not eligible for the additional pay.  Olin further contends that for time worked to qualify for premium pay, (i) it must be scheduled and authorized, (ii) it must not be "casual overtime," (iii) Plaintiffs must complete a time card claiming and describing the time, and (iv) the time card must be approved by their immediate supervisor.  In other words, premium pay was not guaranteed, but conditioned on certain requirements being met.

The Policy defines casual overtime to include:

Time spent either before or after the employee's regular shift for the purposes of exchanging information with another supervisor, taking care of paperwork, or other normal requirements of the position…and time spent attending functions as required of the position, for example staff meetings, safety meetings, seminars or training programs, either before or after the regular shift or on the employee's regularly scheduled day off.

"It is well established that an employee can have no claim under the IWPCA unless the employer and employee agreed that the former would compensate the latter for the particular work allegedly performed." *Brown v. Lululemon Athletica, Inc.,* 2011 WL 741254, at *3 (N.D.Ill. Feb. 27, 2003) (collecting cases); *Gallardo v. Scott Byron & Co.,* 2014 WL 126085, at *14 (N.D. Ill. Jan. 14, 2014).  Here, there was no mutual assent.  Some plaintiffs were unaware the Policy existed or could not recall whether they had ever seen it.

Moreover, the Policy does not provide overtime for all hours worked over forty; casual overtime is excluded.  Plaintiffs were told by their supervisors that the first hour of their shift was casual overtime – the time it took to attending to normal requirements of the position.  Plaintiffs' description of the work performed during this hour fall under the casual overtime exclusion including, for example, unlocking buildings, setting up materials for safety meetings, and paperwork.  The evidence also establishes that Plaintiffs did not work for free during this hour – they testified they understood that nine hours were part of their base salary.  When Plaintiffs submitted timecards for activities Olin considered non-compensable under the Policy, the timecards were rejected or returned with instructions to correct them or provide more information about the tasks for which Plaintiffs sought premium pay.

Given the obvious lack of mutual assent, Olin is also entitled to judgment as a matter of law on Count II.

## <u>Conclusion</u>

For the foregoing reasons, Olin Winchester's Motion for Summary Judgment (Doc. 72) is **GRANTED** and Plaintiffs' Motion for Summary Judgment (Doc. 70) is **DENIED**.  The Clerk of Court is **DIRECTED** to enter judgment accordingly and close this case.

**IT IS SO ORDERED.**

**DATED:  March 30, 2025**

**STACI M. YANDLE**
**United States District Judge**